# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

## No. ACM S32653

———————————

### UNITED STATES
*Appellee*

**v.**

### Jamie PARRA
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 December 2021

———————————

*Military Judge:* Sterling C. Pendleton.

*Sentence:* Sentence adjudged on 19 February 2020 by SpCM convened at Beale Air Force Base, California. Sentence entered by military judge on 3 March 2020: Bad-conduct discharge, confinement for 90 days, and reduction to E-1.

*For Appellant:* Major Matthew L. Blyth, USAF; Jason Beers (legal intern).[1]

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire.

Before LEWIS, ANNEXSTAD and OWEN, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Judge ANNEXSTAD and Judge OWEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

---

[1] Mr. Beers was supervised at all times by an attorney admitted to practice before this court.

LEWIS, Senior Judge:

A special court-martial composed of a military judge alone found Appellant guilty, contrary to his pleas, of one specification of desertion from his unit with intent to remain away permanently, in violation of Article 85, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 885.[2,3] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 90 days, reduction to the grade of E-1, and a reprimand. After considering Appellant's clemency submission and consulting with the staff judge advocate, the convening authority took no action on the findings and took action on the sentence by disapproving the reprimand.

Appellant raises four issues on appeal: (1) whether the evidence was factually insufficient to support his conviction for desertion; (2) whether the trial counsel committed prosecutorial misconduct during sentencing argument on two grounds: arguing facts not in evidence and arguing mendacity despite lacking a factual predicate; (3) whether the sentence was inappropriately severe; and (4) whether the evidence was legally insufficient.[4]

We combine issues (1) and (4). We find no material prejudice to Appellant's substantial rights and affirm the findings and sentence.

## I. BACKGROUND

On 13 November 2018, Appellant enlisted in the Air Force for four years. At the time of the charged offense, between 16 December 2019 and 23 December 2019, Appellant was stationed at his first permanent duty station, Beale Air Force Base (AFB), California. Appellant's unit of assignment was the 9th Maintenance Squadron, located on Beale AFB. Appellant worked in the propulsion flight.

In early to mid-November 2019, Appellant approached his flight chief, Master Sergeant (MSgt) BJ, for "general life issues." At this point, Appellant lived on base with his wife, SP, and their ten-month-old daughter. After learning about the issues Appellant was experiencing, MSgt BJ referred Appellant to three helping agencies on Beale AFB: the chaplain, mental health, and an "em-

---

[2] References to the UCMJ and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[3] Appellant pleaded guilty to the lesser-included offense of absence without leave, a violation of Article 86, UCMJ, 10 U.S.C. § 886.

[4] Appellant personally raises issue (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

bedded counseling entity." According to MSgt BJ, the embedded counseling entity provided "guidance on general life issues, and . . . trials and tribulations of being in the military."

According to Appellant's testimony during the Defense's case-in-chief, he subsequently talked with at least one individual at the embedded counseling entity. In this conversation, Appellant said he learned that "there was no way that [he] was going to be able to get separated from the Air Force" unless he broke some law, like absence without leave (AWOL). Appellant testified this was "the only reason why [he] thought about [going] AWOL." Subsequently, Appellant researched the definitions of AWOL and desertion on the Internet and concluded that if he was away from his duty station for less than 30 days, he would be AWOL, and beyond 30 days, in desertion.[5] Appellant "imagined" that he could "make" or "trigger" his command to separate him from the Air Force if he went AWOL.

On 21 November 2019, Appellant requested 19 total days of local leave. The local leave requests were approved; they exhausted all of Appellant's accrued leave. Appellant used this time to plan and execute the departure of himself and his family from Beale AFB.

On 26 November 2019, Appellant purchased one-way plane tickets to Florida for himself and his family. In the days that followed, Appellant sold his car, which was his primary method of transportation at Beale AFB. Appellant also arranged to ship his other vehicle—which SP primarily used—to Fort Myers, Florida, where SP's family was located.

SP participated fully in the family's preparations to leave Beale AFB. SP used a social media site to attempt to sell a dining set, a living room set, bedroom sets, a washer/dryer set, and televisions. SP sold some of the items and offered to give away the items that did not sell. Appellant and SP left some items outside their on-base house for pick-up, including clothes, toys, and cleaning supplies.

On 12 December 2019, Appellant rented a moving truck and made two trips to the on-base thrift store to donate household items. In the two trips Appellant made, he donated about 75 to 100 items, including end tables, storage tubs,

---

[5] We denied Appellant's motion to attach the results of a similar Internet search conducted after the record of trial was docketed with our court. As we are "constrained by the bounds of the record from the court below" when reviewing findings for legal or factual sufficiency, we found the Internet search conducted during appeal neither relevant nor necessary. *See United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006) (citations omitted). Appellant's trial testimony on his Internet search was unchallenged during trial and we require no further explanation to resolve the raised issues.

microwaves, and small appliances, many of which were fairly new. One volunteer at the thrift shop—the military spouse of the commander of the 9th Maintenance Group—knew SP and was friends with SP on a social media site. The volunteer asked Appellant if they were moving. Appellant lied by saying the family was moving to Roseville, a city near Beale AFB.

On the weekend before his local leave ended, Appellant boarded a plane with SP and their daughter and flew to Florida on the one-way tickets.

On 16 December 2019, at 0700 hours, Appellant did not arrive at work. MSgt BJ—the flight chief—and Appellant's shift lead, a technical sergeant, began to try to determine Appellant's whereabouts. MSgt BJ texted and then called Appellant from MSgt BJ's cell phone. MSgt BJ also called Appellant from his desk phone. Appellant's shift lead tried to reach Appellant on the phone. Neither of them received an answer. At trial, Appellant testified that he received the calls, but ignored them and blocked at least some of the incoming phone numbers.

When MSgt BJ could not reach Appellant via phone or text message, he alerted Appellant's first sergeant, Senior Master Sergeant (SMSgt) SJ. SMSgt SJ called and texted Appellant and received no response. SMSgt SJ and MSgt BJ then went to Appellant's on-base house to perform a welfare check.

On arrival at the house, they noticed both a large pile of trash and several items sitting outside the house. When they knocked on the door, no one answered. MSgt BJ looked in a house window and saw it was mostly empty. MSgt BJ gave SMSgt SJ a boost so he could look through the windows in the garage door. There were items in the garage, but no cars. SMSgt SJ and MSgt BJ consulted with a next-door neighbor, who confirmed that they had the correct house for Appellant.

SMSgt SJ and MSgt BJ next went to the housing office to see if they could get access to the inside of Appellant's house. The housing office's facility manager agreed and accompanied them to the house. After knocking and receiving no answer, the facility manager tried the door and realized it was unlocked and slightly ajar. The three entered the house.

On entry, they immediately noticed that on a half-wall separating the living room from the entryway were two house keys, two mailbox keys, and a garage door opener. No one was inside. Almost all of the furniture was gone, except for one mattress, without linens. For the facility manager, the lack of furnishings was particularly noticeable. He had been inside Appellant's house about a week earlier for a window replacement project. At that point, the house had been fully furnished. As the three walked from room to room, they saw very few personal items. MSgt BJ described it as "random personal effects strewn throughout the house." For example, one child's outfit hung in a closet.

Appellant's service dress coat and some of his blues uniform items were in another closet. Appellant's duty uniforms were not found.

Over the next two to three days, MSgt BJ continued to attempt to reach Appellant by phone without success. The squadron commander also texted Appellant and received no reply. SMSgt SJ obtained Appellant's virtual record of emergency data and notified Appellant's next-of-kin that he was missing. Security forces investigators assumed the lead for the investigation and obtained a search authorization for the house.

Investigator MD, from security forces, conducted a search of Appellant's house, along with an agent from the Air Force Office of Special Investigations (AFOSI). Investigator MD described the house as "very dismantled. Very few personal belongings. It looked like it was gone through and a lot of the important pieces from the household were taken from the house." Investigator MD photographed the house and collected two items of evidence: (1) the receipt showing that SP's vehicle was shipped to Fort Myers, Florida; and (2) Appellant's restricted area badge. The latter had been cut into multiple pieces and was found in the trash.

On 19 December 2019, three days after Appellant failed to arrive for work, Appellant's commander administratively determined that Appellant was a deserter. At this point, Special Agent (SA) MZ from the AFOSI assumed the lead for the investigation. SA MZ attempted to contact Appellant and received no response. SA MZ began coordinating with the Lee County Sheriff's Office in Florida, specifically Deputy JL, to assist with investigative leads in Florida.

Deputy JL explored the first lead, the address where Appellant had shipped SP's vehicle. The owner of the house did not know Appellant. Deputy JL relayed this development to SA MZ. SA MZ realized that SP's mother lived near the address where the vehicle was shipped. SA MZ requested Deputy JL visit SP's mother. Deputy JL agreed and drove the short distance—about a mile away—to see SP's mother. On arrival, Deputy JL saw SP's vehicle parked in the driveway.

Deputy JL further testified she approached the house and knocked on the door. SP answered the door. Deputy JL asked if Appellant was in the house; SP claimed he was not.[6] Deputy JL provided SA MZ's contact information to SP and permitted SA MZ and SP to talk briefly using Deputy JL's phone. Once

---

[6] The military judge sustained an objection to this testimony during direct examination. However, Deputy JL later testified to this same information upon questioning from the military judge. We will consider it, along with the other evidence presented during findings, as the parties did not object and the military judge did not *sua sponte* exclude the testimony.

that call ended, Deputy JL received her phone back and returned to her patrol vehicle. Meanwhile, SA MZ made a call directly to SP to continue the conversation they started on Deputy JL's phone. SP ignored SA MZ's calls.

Before Deputy JL could depart the area, she received a call from SA MZ. Deputy JL learned that SP was ignoring SA MZ's phone calls so she returned to the front door and knocked again. This time SP's aunt answered the door. SP's aunt denied that Appellant was present. Deputy JL asked if she could step inside the house and speak to SP again. SP's aunt agreed and Deputy JL entered the house. Within a minute or two, Appellant walked out of a bedroom. Deputy JL confirmed that Appellant knew why she was there and then handcuffed him and took him to her patrol vehicle.

Once in the patrol vehicle, Deputy JL informed Appellant that there was a federal warrant out for his arrest. Deputy JL began the process of confirming the validity of the arrest warrant—a necessity before Appellant could be taken to jail. While waiting for warrant confirmation, Deputy JL read Appellant his rights under *Miranda v. Arizona*;[7] Appellant stated he understood and waived those rights. Deputy JL asked Appellant why he did it. Appellant responded with words to the effect of, "[I]t wasn't what I thought it was going to be. It wasn't for me." Appellant also told Deputy JL "he was going through some emotional things" and "was seeking counseling or a therapist while he was in [the Air Force]." Appellant made no statements to Deputy JL that he planned to turn himself in or return to his unit at Beale AFB.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

Appellant, through his counsel, challenges the factual sufficiency of his desertion conviction and argues that the Government failed to prove that he intended to remain away from his unit permanently. To support this argument, Appellant references his trial testimony that his plan was to settle SP in Florida and then turn himself in at MacDill AFB, Florida. Appellant also asserts that the Internet research on desertion and AWOL that he conducted prior to leaving Beale AFB showed that he did not intend to remain away permanently from his unit. Appellant references one of the reasons for his absence as the "psychological consequences" from a several-year struggle with tinnitus, a condition he testified worsened during his time in the Air Force. Finally, Appellant

---

[7] 384 U.S. 436 (1966).

notes that he traveled to a foreseeable location and took no steps to establish himself there permanently.

Appellant also addresses some of the Government's evidence from his trial in his factual sufficiency challenge. Regarding the sale and disposal of personal property, Appellant asserts that he did not know if, upon return, he would return to his on-base house or reside in the dormitories. He also argues that the sale and disposal only shows that "*his family*" was not returning to Beale AFB. Regarding his destruction of his restricted area badge, Appellant argues that (1) he did not believe the Air Force would allow him to resume duties in a restricted area given his conduct and "mental health issues;" and (2) he did not want to risk the badge falling into the wrong hands. Regarding ignoring the calls and text messages from superiors in his unit, Appellant points to his trial testimony in which he stated that he was "terrified of what they would think and [he] was afraid of triggering something that was going to be bad."

Appellant personally raises the issue of legal insufficiency of the evidence against him. He argues his conviction rests on unsupportable inferences drawn from circumstantial evidence. He also claims the findings show a categorical disregard for his testimony. He characterizes the Government's circumstantial evidence of his intent to remain away permanently as "meager."

The Government disagrees with Appellant by arguing that the evidence was legally and factually sufficient to support the desertion conviction. The Government argues that we should reasonably draw an inference on intent to remain away permanently from the evidence presented at trial. Appellant replies arguing why we should not draw such inferences from the evidence.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the [P]rosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the [P]rosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "the standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration, internal quotation marks, and citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *Wheeler*, 76 M.J. at 568 (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

For the desertion specification, a violation of Article 85, UCMJ, the Government had to prove beyond a reasonable doubt that: (1) on or about 16 December 2019, Appellant absented himself from his unit, to wit: the 9th Maintenance Squadron, located at Beale AFB, California; (2) such absence was without authority; (3) Appellant, at the time the absence began or at some time during the absence, intended to remain permanently away from his unit; (4) Appellant remained absent until on or about 23 December 2019; and (5) Appellant's absence was terminated by apprehension. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 9.b.(1).

"Findings may be based on direct or circumstantial evidence." Rule for Courts-Martial (R.C.M.) 918(c). The United States Court of Appeals for the Armed Forces (CAAF) "has long recognized that the [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted). "[T]he Supreme Court [of the United States] has explained: 'Circumstantial evidence . . . is intrinsically no different from testimonial evidence. . . . [With] both, the jury must use its experience with people and events in weighing the probabilities.'" *United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (omissions and third alteration in original) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

"The intent to remain away permanently may be proved by circumstantial evidence." *MCM*, pt. IV, ¶ 9.c.(1)(c)(iii); *see also United States v. Oliver*, 70 M.J. 64, 66 (C.A.A.F. 2011). The intent to remain away permanently from the unit "may be formed any time during the unauthorized absence. The intent need not exist throughout the absence, or for any particular period of time, as long as it exists at some time during the absence." *MCM*, pt. IV, ¶ 9.c.(1)(c)(i). If Appellant had the intent to remain away permanently from his unit during the unauthorized absence, "it is no defense that [he] also intended to report for duty elsewhere . . . ." *MCM*, pt. IV, ¶ 9.c.(1)(c)(ii).

The *MCM* provides an "illustrative" list from which an inference may be drawn that an accused intended to remain absent permanently, including, *inter alia*: (1) if the period of absence was lengthy; (2) if an accused attempted to, or did, dispose of uniforms or other military property; (3) if an accused purchased a ticket for a distant point or was arrested, apprehended, or surrendered a considerable distance from his station; (4) if an accused could have conveniently surrendered to military control but did not; (5) if an accused was dissatisfied with the his unit or with military service; (6) if an accused made remarks indicating an intention to desert; or (7) if an accused made preparations indicative of an intent not to return (for example, financial arrangements). *See MCM*, pt. IV, ¶ 9.c.(1)(c)(iii).

The *MCM* also provides a non-exhaustive list of circumstances that may tend to negate the inference that an accused intended to remain away permanently, including: (1) previous long and excellent service; (2) if an accused left valuable personal property in the unit; (3) if an accused was under the influence of alcohol or drugs during the absence. *See id.*

### 3. Analysis

#### a. Legal Sufficiency

We disagree with Appellant's personal assertion that the circumstantial evidence of his intent to remain away permanently from his unit was "meager." Appellant meticulously planned his departure from Beale AFB by selling his primary vehicle, shipping SP's vehicle to an address in Florida, purchasing one-way plane tickets, selling or donating furniture and household items, falsely stating that he was moving to a nearby off-base location, and cutting up his restricted area badge. Combining these facts with Appellant's apprehension in Florida, a rational factfinder could conclude that Appellant did not intend to return to his unit at Beale AFB at some point after his unauthorized absence began. The military judge received ample circumstantial evidence to conclude that the Government proved each of the essential elements of the offense beyond a reasonable doubt.

Appellant also personally asserts that the military judge categorically disregarded his testimony. We see nothing in the record to support this assertion. Instead, it appears to us that the military judge discounted the part of Appellant's testimony where he denied forming the intent to remain away permanently from his unit. It appears to us that the military judge relied on other portions of Appellant's testimony, such as specific actions he took before and during his absence. These actions could reasonably be used to infer that Appellant actually intended to remain away permanently at some point during his unauthorized absence. The "standard for legal sufficiency involves a very

low threshold to sustain a conviction" and the Government's evidence at trial exceeded that threshold. *See King*, 78 M.J. at 221.

### b. Factual sufficiency

Regarding factual sufficiency, Appellant argues that the Government did not prove beyond a reasonable doubt his intent to permanently remain away from his unit. We are not persuaded. Desertion cases are fact-specific and this case is no different. In our fresh look at the evidence presented at trial, we are ourselves convinced the Government proved the essential elements beyond a reasonable doubt, including the intent element.

Regarding Appellant's supposed plan to turn himself in at MacDill AFB, we note that it lacked specificity when compared to his meticulously planned departure from Beale AFB. At one point in his testimony, Appellant claimed that he was going to turn himself in after a "very bad . . . stomach virus or something" ended. At another point, Appellant testified that he delayed turning himself in because he was "afraid." Regarding his method of travel to MacDill AFB, Appellant said he would "[j]ust drive over, I don't know, take a bus or something." As Appellant sold his vehicle in California, a plan to drive over to MacDill AFB[8] seemed ill-conceived. Finally, Appellant's vague plan to turn himself in at MacDill AFB with the hope it would trigger an administrative separation is akin to an intent to report to duty elsewhere, which the *MCM* indicates is not a defense to desertion from one's unit, pt. IV, ¶ 9.c.(1)(c)(ii). Further, Appellant appeared to leave very little of value behind in California.

We carefully considered Appellant's trial testimony where he denied that he had the requisite intent. We conclude that this portion of Appellant's testimony lacks support when considered in light of the other evidence. We attach significance to the testimony of Deputy JL, who, after arresting Appellant and placing him in her patrol car, asked Appellant why he left the Air Force. Appellant provided details to Deputy JL about counseling and mental health struggles, and his conclusion that the Air Force was not for him and not what he thought it would be. This is strong evidence of Appellant's state of mind, shortly after the offense was complete. The *MCM* includes an appellant's dissatisfaction with his military service as one circumstance from which intent may be inferred. Appellant plainly stated his dissatisfaction with the Air Force to Deputy JL soon after his arrest and we see that dissatisfaction as consistent with the actions he took before, during, and after his departure.

Appellant had the right to remain silent when questioned by Deputy JL and the right to remain silent at trial. If he exercised those rights, his silence

---

[8] MacDill Air Force Base is located near Tampa, Florida, about 140 miles away from Fort Myers, Florida.

could not be used against him. However, he chose to speak both times and therefore we consider how his trial testimony differed from his earlier statements. Appellant did not mention to Deputy JL that he was trying to settle his family in Florida before returning to his unit. Appellant did not mention any plan to return to his unit or base in California. Appellant did not explain that his absence was just temporary or that he was "imagining" an attempt to "make" or "trigger" his command into separating him from the Air Force because he was only AWOL. He did not offer that he planned to turn himself in at MacDill AFB. He did not state that he was sick and that this delayed his departure for MacDill AFB. He did not mention that being afraid of someone or something delayed his departure for MacDill AFB. Had Appellant told Deputy JL any of these things, his arguments on appeal—and likely at trial—regarding his intent would carry greater weight.

We also do not overlook that SP and her aunt lied to Deputy JL about Appellant's whereabouts immediately prior to his arrest. We find their evasions relevant to the question of Appellant's intent. To be clear, we are not suggesting that SP and her aunt needed to or did share Appellant's intent. Rather, their deception, which occurred while Appellant was inside the house, suggests that Appellant was not interested in turning himself in when the first opportunity presented itself. We consider this evidence—along with the other evidence—in concluding Appellant, at some point, formed the intent to permanently remain away from his unit. Such a conclusion is consistent with Appellant blocking and ignoring calls from his unit leadership, leaving his on-base house in the manner he did, selling his car, shipping SP's car, destroying his restricted area badge and leaving it in the trash, and lying to the 9th Maintenance Group commander's spouse about where he and SP were moving.

Appellant's unauthorized absence was short—only seven days—before it was terminated by apprehension. However, the length of absence is only one factor of the intent analysis, and there is no minimum number of days necessary to uphold a conviction for desertion. For example, the United States Navy-Marine Corps Court of Criminal Appeals considered a legal and factual sufficiency challenge to a desertion conviction from an appellant who was absent four days before being apprehended at a local hotel. *United States v. Ricks*, No. 201700309, 2019 CCA LEXIS 176, at *13–17 (N.M. Ct. Crim. App. 16 Apr. 2019) (unpub. op.). The court in *Ricks* assessed the evidence and reasonable inferences from it before ultimately affirming the conviction for desertion. *Id.* at *16–17. Here, the absence was longer than that in *Ricks*. While a shorter length of the absence overall weighs in Appellant's favor, we do not see reasonable doubt when we consider the context—that the efforts of Deputy JL and SA MZ resulted in Appellant's unauthorized absence being quickly terminated by apprehension.

The parties have asked us to draw certain inferences from the evidence presented, or the absence of certain evidence. Two of the requested inferences involve the whereabouts of Appellant's military identification card and his duty uniforms. On the former, no evidence was presented at trial. On the latter, the only evidence presented was that Appellant's duty uniforms were not located with the blues uniforms left behind at his on-base house. We are not persuaded that we should draw the inferences the parties have requested regarding Appellant's military identification card and duty uniforms.

### c. Conclusion

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," we find the evidence was legally sufficient to support Appellant's conviction for desertion as charged. *See Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for desertion is both legally and factually sufficient.

## B. Sentencing Argument

### 1. Additional Background

Appellant asserts trial counsel committed prosecutorial misconduct on two grounds: (1) arguing facts not in evidence; and (2) arguing mendacity when no factual predicate existed. Civilian defense counsel raised no objections during trial counsel's sentencing argument. Appellant acknowledges the high hurdle of asserting plain error in arguments before a military judge alone, but argues we should have misgivings about whether the military judge sentenced Appellant based on the evidence alone.

Trial counsel began sentencing argument with the facts of the case, including a recitation of Appellant's statements to Deputy JL and the preparations Appellant made before leaving Beale AFB. Trial counsel then attempted to describe desertion as a military-specific crime as follows:

> . . . There are very few crimes in the military that are specific to this branch of the service, to the military generally, such as desertion, and AWOL[,] and dereliction of duty.
>
> The reason why these are specific are because they have consequences that are unique. They have consequences to national security. There are consequences to Airmen's safety. To the mission. The accused decided that he was just done with all of that. He decided when he was preparing and doing all those things that he didn't want to be here anymore. It is also aggravating

12

because it would be understandable, for example, if he was downrange in the midst of combat and something bad [was] happening and having that fear and wanting to leave. That's understandable. Not justifiable, but understandable. Or if he was tasked for deployment and had fears about what was coming in the future. That is also understandable. Not justifiable, but it is understandable.

Trial counsel continued by returning to the specific facts of Appellant's desertion, before describing evidence presented by the Defense during sentence about Appellant's positive upbringing and values. Trial counsel argued a bad-conduct discharge would assist Appellant in making better future decisions and punish him. Trial counsel next addressed the length of confinement. Trial counsel then reached the issue of mendacity by highlighting a portion of Appellant's findings testimony where Appellant agreed that if he had been returned by the Air Force to Beale AFB he might have lived in the base's dormitories or might have lived in his vacant house:

Your Honor, I would draw your attention to what happened also during the course of findings and take that into account for purposes of mendacity. We heard that the accused on his cross-examination, gave three different explanations as to what he intended to do. First he said he was going to live in dorm housing. But we know from his First Sergeant that that was never the case and also the accused admitted that, that he never put in a request. The second thing that he said was that his plan was to actually go and live in a vacant house with no dishes, but that was his plan. No furniture, he was just going to live there by himself in a vacant house. But it simply doesn't make sense. The third thing that he said he was going to do was none of that. He wasn't going to return to Beale, he was going to go to MacDill and turn himself in.

So there are three different stories that happened during the course of findings, Your Honor. It shows that there were false statements made. That there were not clear intentions that were brought forth. That level of honesty was not there. That can be taken into account for purposes of mendacity in determining the appropriate sentence in this case.

Trial counsel ended with a general deterrence argument that included a claim that desertion is "an important crime that has impacts. It has impacts here locally. It has impacts downrange. It has impacts for the total force. These are things that should be taken into account."

Civilian defense counsel responded to some of trial counsel's arguments during his sentencing argument. Regarding trial counsel's comments about desertion in the midst of combat being understandable, the Defense responded, "[T]hey also argue perversely that desertion in the face of an enemy is less of a crime [than] desertion, essentially in peacetime for seven days for an Airman with one year, one month and three days of service." Regarding mendacity, the Defense responded, "[T]hey argue for mendacity off the fact that [Appellant's] mind may have changed multiple times. That's not right, Your Honor. There is nothing that he said that was a lie."

On appeal, the Government argues that trial counsel's references to national security, downrange impacts, Airmen's safety, the mission, and the total force were not used to suggest Appellant's offense caused these impacts or that he should be punished for them. Instead, the Government posits that the references related to the need for the sentence to reflect the seriousness of the offense and to promote adequate deterrence. In the Government's view, some of the references explained why the military criminalized desertion and why serious punishment is appropriate. The Government concedes these sections of the trial counsel's argument were "confusing" but asserts they were not erroneous. The Government also argues there is no reasonable probability that the outcome of the proceeding would have been different if the alleged improper arguments had not been made. *See United States v. Norwood*, 81 M.J. 12, 20 (C.A.A.F. 2021).

Regarding the mendacity argument, the Government argues Appellant's testimony established the necessary factual predicate so there is no plain or obvious error or material prejudice.

As described below, we find no material prejudice from trial counsel's sentencing argument in this judge-alone case.

**2. Law**

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *See United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). "As all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'overstep[ped] the bounds of that propriety and fairness which should

characterize the conduct of such an officer in the prosecution of a criminal of-fense.'" *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or in-action by a prosecutor in violation of some legal norm or standard, *e.g.*, a con-stitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). In deter-mining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001). We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omit-ted).

"Where improper argument occurs during the sentencing portion of the trial, we determine whether or not we can be confident that [an appellant] was sentenced on the basis of the evidence alone." *United States v. Pabelona*, 76 M.J. 9, 12 (C.A.A.F. 2017) (quoting *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014)). In assessing prejudice from improper argument, we analyze: "(1) the severity of the misconduct, (2) the measures adopted to cure the mis-conduct, and (3) the weight of the evidence supporting the conviction." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (quoting *Fletcher*, 62 M.J. at 184). The CAAF has identified five indicators of severity:

> (1) the raw numbers[—]the instances of misconduct as compared to the overall length of the argument[;] (2) whether the miscon-duct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations[;] and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted). In *Halpin*, the CAAF extended the *Fletcher* test to improper sentencing argument. 71 M.J. at 480. In assessing prejudice, "the lack of a defense objection is 'some measure of the minimal im-pact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

"When the issue of plain error involves a judge-alone trial, an appellant faces a particularly high hurdle." *United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000). As the sentencing authority, a military judge is presumed to

know the law and apply it correctly, absent clear evidence to the contrary. *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citations omitted).

An accused's false testimony is an appropriate consideration as an indication of an accused's rehabilitative potential in arriving at an appropriate sentence for offenses of which he has just been convicted. *United States v. Warren*, 13 M.J. 278, 284–85 (C.M.A. 1982). "When sentencing is by members, the military judge must instruct the members that they may not consider trial counsel's mendacity argument 'unless they conclude that the accused *did* lie under oath to the court' and that 'such lies must have been, in [the members'] mind, "willful and material."'" *United States v. Jenkins*, 54 M.J. 12, 19–20 (C.A.A.F. 2000) (alteration in original) (quoting *Warren*, 13 M.J. at 285–86).

### 3. Analysis

#### a. Facts not in evidence

We find no material prejudice to a substantial right of Appellant from the portions of trial counsel's argument that may have raised facts not in evidence. We are confident that the military judge sentenced Appellant based on the evidence alone.

We agree with the Government that portions of the trial counsel's argument were confusing. In our view, this confusion has led to the claims that trial counsel referenced facts not in evidence. However, we also note that confusing arguments often lack persuasiveness which allows us to be confident that the military judge sentenced Appellant based on the evidence alone, and that is what we see in this judge-alone case.

For example, trial counsel's attempts to unfavorably compare Appellant's offense to a desertion in combat or after a deployment tasking were unpersuasive, as evidenced by civilian defense counsel's counter-argument.[9] Further, trial counsel's argument that desertion in combat or after a deployment were "understandable" seemed to imply that the reasoning underlying Appellant's offense was not easy to understand. We cannot discern why trial counsel would see the evidence in this manner. The trial evidence, much of which was not in dispute, showed the reasons why Appellant decided to desert his unit.

Trial counsel's references to desertion and the consequences to national security, safety, and the mission are confusing in the context of Appellant's case.

---

[9] We note, for example, that the President has set a higher maximum confinement term in a general court-martial for desertion in time of war, or with intent to avoid hazardous duty or shirk important service, than Appellant's offense—desertion terminated by apprehension. *See MCM*, App. 12, at A12-1.

There was no evidence presented in aggravation that Appellant's desertion involved any of these matters. If trial counsel wanted to argue these matters, evidence in aggravation should have been presented. It is possible that trial counsel was attempting to argue general deterrence and did so in an unclear manner. What is clear to us is that trial counsel's argument on the whole covered various sentencing principles, focused on sentencing Appellant on an individualized basis, and did not invite the military judge to sentence Appellant primarily on general deterrence. *See United States v. Lania*, 9 M.J. 100, 104–05 (C.M.A. 1980) (finding no prejudicial error when the trial counsel's argument as a whole did not invite the members to rely primarily on general deterrence, and did not tend to distract the members from the task of imposing a tailored sentence to the accused). However, given the lack of clarity with trial counsel's words and the absence of aggravation evidence, we apply the three *Fletcher* factors.

Applying the first *Fletcher* factor, we consider trial counsel's arguments related to facts not in evidence to be of low severity. The "raw numbers" were not extensive when compared to the overall length of the argument. Appellant does not allege prosecutorial misconduct was committed during findings argument or any other portion of the court-martial outside of sentencing. Trial counsel's sentencing argument was short, just three pages in a transcript than exceeded 200 pages. For the second *Fletcher* factor, the military judge took no measures in response to the argument; however, civilian defense counsel adeptly articulated how some of trial counsel's arguments lacked merit. On the third *Fletcher* factor, the weight of the evidence supporting the conviction and sentence were strong. The lack of a defense objection is some measure of the minimal impact of this argument. *See Gilley*, 56 M.J. at 123. On the whole, we see trial counsel's arguments as confusing and unhelpful. However, we conclude that in this judge-alone trial, there is no indication the military judge was unaware of which facts were or were not in evidence. Appellant has not demonstrated material prejudice.

### b. Mendacity

We find that trial counsel had a sufficient factual predicate to argue that Appellant lied during his trial testimony. We find no error, let alone plain or obvious error, from trial counsel's arguments that Appellant made false statements and lacked honesty in parts of his testimony, and that this falsity could be taken into account by the military judge. Our review of the record reveals several contradictions during Appellant's testimony regarding intent and his plan to return to his unit. From these inconsistencies, trial counsel could reasonably argue that the military judge could consider mendacity. Of course, civilian defense counsel's argument—that Appellant did not lie in his testimony—was also reasonable.

We recognize that trial counsel's argument did not attempt to provide a complete statement of the law during the mendacity portion of the argument. A complete argument would have carefully stated that the military judge could only consider mendacity if he determined Appellant willfully lied under oath about a material issue. *See Jenkins*, 54 M.J. at 19–20. A complete argument would have also have included a statement that mendacity could only be considered as an indication of Appellant's rehabilitative potential. *See id.* at 20.

However, we see nothing in the record, let alone clear evidence to the contrary, to suggest that the military judge did not know the law on mendacity and did not apply it properly in Appellant's case. *See Sanders*, 67 M.J. at 346 (citations omitted). Appellant has failed to meet his high hurdle to show plain error from the trial counsel's brief argument that the military judge could consider mendacity based on Appellant's findings testimony.

## C. Sentence Severity

### 1. Additional Background

Appellant asserts that his sentence was inappropriately severe for three reasons. First, Appellant claims the nature of the offense was not egregious, given the short length of his unauthorized absence and a lack of government evidence on unit impact. Second, Appellant argues the matters in mitigation were compelling, based on Appellant's struggles in the military and the fact that he was "taking steps to protect his family, albeit in the wrong manner." Third, Appellant claims the long-term stigma of a bad-conduct discharge is excessive because he had no prior disciplinary paperwork; he missed the birth of his daughter, in person, so he could finish technical training; and he accepted responsibility for his actions in his unsworn statement. Overall, in Appellant's view, general deterrence of desertion offenses does not justify imposing the punishment he received.

The Government argues the sentence was appropriate. It notes the maximum sentence available was the jurisdictional limit of a special court-martial: a bad-conduct discharge, confinement for one year, forfeiture of two-thirds' pay per month for 12 months, and reduction to the grade of E-1. Trial counsel argued an appropriate sentence would include a bad-conduct discharge and nine months of confinement. Civilian defense counsel argued that seven weeks of confinement would be appropriate for a seven-day desertion. The military judge determined an appropriate sentence was a bad-conduct discharge, confinement for 90 days, reduction to the grade of E-1, and a reprimand. The convening authority disapproved the reprimand when he took action on the sentence.

### 2. Law

We review sentence appropriateness de novo. *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (citation omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *Sauk*, 74 M.J. at 606 (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 3. Analysis

We considered Appellant's reasons for why he believes the bad-conduct discharge was inappropriately severe. We are not persuaded. First, we agree that Appellant's desertion was short and that the Government did not present additional unit impact evidence during sentencing. But, we also consider how Appellant's desertion was terminated, how he responded to his unit's efforts to assist him before his offense, and how he responded to his unit's efforts to reach him after he failed to report for duty.

We also considered Appellant's evidence in mitigation. We do not characterize the witness testimony or character statements presented by the Defense as compelling, but we nonetheless find that this constituted important evidence in determining an appropriate sentence. We have no doubt that the military judge considered the evidence in mitigation in determining that 90 days of confinement was appropriate, rather than adopting trial counsel's suggestion for three times that amount. Additionally, as the military judge ruled that Appellant would receive a total of 98 days of confinement credit, Appellant did not serve post-trial confinement.

Appellant's third reason addresses the long-term stigma of a bad-conduct discharge. We are in complete agreement that a bad-conduct discharge will have a long-term stigma on Appellant. We disagree that it is excessive or inappropriate for this desertion offense committed under these circumstances. Appellant's lack of disciplinary history, sacrifice in missing his daughter's birth, and acceptance of responsibility in his unsworn statement are all relevant matters in determining an appropriate sentence. Even when considered collectively and in light of R.C.M. 1003(f), these matters are insufficient for us to conclude a bad-conduct discharge was inappropriately severe.

We have considered the nature and seriousness of this desertion offense, and have given individualized consideration to Appellant, his background, his record of service, his stated reasons for committing the offense, and his apology in his unsworn statement. After careful consideration of the above and the matters contained in the record of trial, we conclude the sentence—including the bad-conduct discharge—was not inappropriately severe.

### III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.[10]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[10] Appellant correctly identifies that the Statement of Trial Results failed to include the command that convened this court-martial, as required by R.C.M. 1101(a)(3). Appellant asserts no prejudice from this error, and we find none. *See United States v. Moody-Neukom*, No. ACM S32594, 2019 CCA LEXIS 521, at *2–3 (A.F. Ct. Crim. App. 16 Dec. 2019) (unpub. op.) (per curiam).